UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

    DALE S. SCHULTZ                                   CASE NO. 07-64144
    WENDY J. SCHULTZ

                                                  Chapter 7

                      Debtors
--------------------------------------------------------

APPEARANCES:

DAVID J. GRUENEWALD, ESQ.
Attorney for Debtors
P.O. Box 69
Manlius, New York 13104

GETNICK, LIVINGSTON, ATKINSON,            PATRICK G. RADEL, ESQ.
  GIGLIOTTI & PRIORE, LLP                          Of Counsel
Attorneys for Malen Associates & Pallino
  Receivables
258 Genesee Street
Utica, New York 13502

Hon. Stephen D. Gerling, U.S. Bankruptcy Judge

**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

The Court considers herein a motion filed by the Dale and Wendy Schultz ("Debtors") on June 9, 2008, which seeks damages from Pallino Receivables, LLC ("Pallino"), Malen & Associates ("Malen"), as agent for Pallino (jointly the "Respondents"), and Lloyd Shor, Utica City Marshal ("Shor")[1] for a willful violation of the automatic stay pursuant to § 362(k) of the U.S. Bankruptcy

---

[1] At the evidentiary hearing held on November 5, 2008, Debtors' attorney advised the Court that the Debtors would not be proceeding against Shor. Therefore the Court has made no determination whether or not Shor wilfully violated the automatic stay.

Code (11 U.S.C. §§ 101-1532) ("Code").

The motion first appeared on the Court's calendar on June 24, 2008 at Utica, New York, but was adjourned to the July 29, 2008 motion calendar. On July 29th, the Court, after hearing limited argument, directed that the contested matter be set down for an evidentiary hearing. The evidentiary hearing was thereafter held on November 5, 2008. Following the conclusion of the hearing, the Court gave all parties the opportunity to file memoranda of law by December 5, 2008, after which the matter would be submitted to the Court for decision.[2]

## JURISDICTION

This Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (2)(O).

## FACTS

On December 22, 2007 the Debtors filed a voluntary petition pursuant to Chapter 7 of the Code and listed therein on Schedule F, Creditors Holding Unsecured Non-priority Claims, "Pallino Receivables, LLC" with the notation, "Previous Creditor: MBNA" and listing the amount of the

---

[2] While Debtors' motion seeks damages for a willful violation of the automatic stay pursuant to Code § 362(k), at the time of the activation of the subject income execution in May of 2008, the Debtors had actually received a discharge, thereby replacing the automatic stay with the discharge injunction imposed by Code § 524(a). However, as is set out below, the actions of Pallino and Malen in failing to insure the termination of the income execution occurred while the stay was still in effect.

claim as "0.00". On the same schedule, Debtors listed "Malen &Assoc" with the notation "Collection Attorney for Pallino Receivables, LLC, Previous Creditor: MBNA" and again listing the amount of the claim as "0.00". In Item #4 of the Statement of Affairs included with the petition and entitled "Suits and administrative proceedings, executions, garnishments and attachments," it is indicated that there was a suit entitled" Pallino Receivables, LLC vs. Dale S. Schultz a/k/a Dale Schultz" pending in the City Court of the City of Rome, County of Oneida.

The parties have stipulated that on or about September 24, 2007, Pallino obtained a judgment against Debtor Dale S. Shultz ("D. Schultz") in the suit referred to above. That pre-petition, on or about October 4, 2007, an income execution was issued to Shor presumably in an effort to collect on the judgment. That on December 27, 2007, Malen and Pallino received notice of the Debtors' bankruptcy filing and on that same day, Malen "issued releases to the banks who had restrained funds belonging to the Debtors as well as a letter issued to the Onondaga County Sheriff directing him to stop the garnishment." (*See* ¶¶ 1,2 and 4 of the Response of Malen and Pallino, dated June18, 2008, a portion of which was stipulated into evidence at the hearing held on November 5, 2008 as Debtors' Exhibit C)[3]. The parties further stipulate that it was not until Malen was served with the instant motion, (on or about June 9, 2008), that it became aware that the December 27th letter was addressed to the "sheriff of the wrong county. The letter should have been issued to the Utica City Marshal Lloyd Shor."

It was D. Schultz's testimony at the evidentiary hearing that in early May 2008 Shor, acting

---

[3] At the evidentiary hearing, it was not entirely clear that the parties stipulation to the admission of Exhibit C was intended to include the entire Response of Malen and Pallino, dated June 18, 2008, or simply paragraphs 1 through 4. For purposes of this Memorandum-Decision, the Court will limit the stipulation to paragraphs 1 through 4 of the Response.

pursuant to the income execution issued by Pallino and Malen, actually garnished his wages while he was working for "Centrex Labs" at a facility Centrex operated at Rome Hospital, located at 1617 North James St., Rome, New York. He further testified that while he had previously been employed by Rome Hospital in the same capacity, in or about September or October 2007, Centrex took over the lab at Rome Hospital and all of its employees[4]. On May 8, 2008, the office of the Debtors' attorney, David J. Gruenewald, Esq., faxed a notification to Shor advising him of D. Schultz's bankruptcy filing and requesting that Shor notify D. Schultz's employer "immediately in order to stop any further money being deducted from the Debtor's wages." On May 21, 2008, Gruenewald's bankruptcy paralegal again contacted Shor's office to inquire as to when D. Schultz's employer had been notified. The paralegal was advised by a person in Shor's office that it was the policy of that office that it receive a payment before notifying the employer to cease the income execution. At that point, Gruenewald's paralegal advised the person in Shor's office that "they had a duty to stop the execution immediately, especially since the judgment creditor and the judgment creditor's attorney were named in the original petition and had not stopped their collection efforts. My bankruptcy paralegal further explained that their office was violating bankruptcy law by refusing to notify the Debtor's employer." *See* ¶¶ 15 and 16 of the Affirmation of David J. Gruenewald, dated June 9, 2008, stipulated into evidence as Part of Exhibit C at the November 5, 2008 hearing.

Debtor D. Schultz testified that following the service of the income execution on his employer, two of his paychecks were actually garnished, and that, as a result, he was unable to make

---

[4] There was testimony at the evidentiary hearing to the effect that Shor had altered the income execution, without any authorization from Pallino or Malen, by changing the name of D. Schultz's employer from Rome Hospital to Centrex.(Testimony of Amanda Scocozzo ("Scocozzo"), Transcript ("Tr") of November 5, 2008 Evidentiary Hearing at 51-55).

5

his monthly mortgage payment. In addition, he testified that he could not sleep at night and began to experience a shortness of breath. He testified that he had a pacemaker and an artificial heart valve at the time and that he went to an emergency room towards the end of May 2008 to find out what was going on. He further testified that he went back to the emergency room in June of 2008, and finally in July he had to have the pacemaker replaced because the battery had drained, resulting in a reduced blood flow in his body. Debtor D. Schultz offered no testimony medically linking the replacement of the pacemaker to the stress brought about by the garnishment of his wages. He testified that he was placed on certain medications for which he had a co-pay obligation for the refills. He also testified that he lost a total of three days from work due to the emotional distress caused by the enforcement of the income execution. He estimated that he had incurred approximately $1200 in actual damages between the time lost from work and the cost of the medications.[5]

On cross examination, D. Schultz acknowledged that the total amount initially withheld from his wages was approximately $73, and that his monthly mortgage payment was $564. He also denied that his having to file for bankruptcy relief generally contributed to his emotional distress, and he acknowledged that his mortgage holder had not sought stay relief in order to foreclose on his home mortgage.[6]

---

[5]Counsel for Pallino and Malen objected to all of the Debtor D.Schultz's testimony regarding actual monetary damages due to his physical and mental condition allegedly brought on the enforcement of the income execution asserting that the Debtors' pleadings alleged damages only due to emotional distress. The Court overruled that objection concluding that such monetary damages can result from emotional distress and that if Pallino and Malen had concern over the type of the damages claimed they could have conducted pre hearing discovery.

[6]The Court notes that the CM/ECF Docket of the Debtors' case indicates that on February 29, 2008, the Court entered an Order granting AMERICU Credit Union relief from the automatic

6

Pallino and Malen proffered the testimony of Scocozzo who outlined the steps taken by Malen when it receives notice of a bankruptcy filing and specifically what was done in the case of the Debtors. She noted that when the income execution was initially issued it was sent to Shor and listed the name of Debtor D. Schultz's employer as Rome Hospital . She testified that the income execution had been altered by someone after it had been issued by Malen to change the name of Debtor D. Schultz's employer from Rome Hospital to "Centrex Labs." Upon being notified of the Debtors' bankruptcy around the end of December 2007, she acknowledged that a letter terminating the execution was sent to the Sheriff of Onondaga County, rather than to Shor. She identified a "drop down menu" as it appeared on her computer, on which Onondaga County and Oneida County are located next to each other and admitted that the letter was sent to the Onondaga County Sheriff in error. The letter advises the sheriff to close out the garnishment. Finally, she testified that following the issuance of the letter to the Onondaga County Sheriff, Malen did not receive any indication that the Sheriff had received the letter in error, and the first time she became aware of the error was in May of 2008, " when this started." *See* Tr. of November 5, 2008 Evidentiary Hearing at 56-57. On cross-examination, Scocozzo acknowledged that Malen did not keep a copy of the income execution in its file but denied that any alteration of the document occurred in Malen's office. She acknowledged that once the initial letter withdrawing the execution was sent to the Onondaga County Sheriff, no follow-up was undertaken. She also indicated that the Sheriff never advised Malen of the error.

On examination by the Court, Scocozzo testified that once an execution is sent out for levy, there is usually a follow-up by Malen in approximately 60 days to see if any money has been

---

stay as to it's "lien interest in the property known as 12083 State Route 46, Boonville, N.Y. 13309".

7

collected. In the Debtors' case, she opined that the follow-up probably would have occurred in January 2008, but that their intervening bankruptcy filing closed out the account. *See* Tr. of November 5, 2008 Evidentiary Hearing at 68-69.

## DISCUSSION

The law with regard to wilful violations of the automatic stay in the Second Circuit was announced almost twenty years ago in the case of *Crysen/Montenay Energy Co. v. Esselen Assoc., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098 (2d Cir. 1990). That case instructs that "any deliberate act taken in violation of the stay, which the violator knows to be in existence, justifies an award of actual damages." *Id.* at 1105. Pallino and Malen argue, however, that it was not the intent of Congress to impose strict liability on a creditor, citing a number of cases, none of which have their genesis in the Second Circuit. They contend that an innocent clerical error should not subject them to sanctions for having violated the automatic stay. Further, they assert that their actions upon being notified of the Debtors' bankruptcy were proper. They issued releases to the bank where they had restrained the Debtors' account, and they attempted in good faith to cancel the income execution. They dispute that they had a duty to take any follow-up action to insure that the income execution had, in fact, been terminated. Pallino and Malen also note that had Shor not altered the execution, changing the name of D. Schultz's employer, nothing would have been withheld from his pay postpetition. They also opine that had Shor called them with a request to alter the execution, they would have become immediately aware that the letter withdrawing the execution had been sent to the wrong party.

Finally, Pallino and Malen argue that D. Schultz's testimony went well beyond his initial claim of damages for emotional distress. They contend that it was error for the Court to have allowed testimony regarding certain medical procedures he underwent, his lost wages and the cost of medications prescribed for him. Additionally, they assert that the D. Schultz did not establish any causal relationship between these alleged damages and execution against his wages. In addition, they assert that neither the Debtors nor their attorney attempted to mitigate their damages by contacting either Pallino or Malen on the date they learned of the execution.

The Debtors dispute Pallino and Malen's innocent clerical error theory. They suggest that any creditor similarly situated could argue that it mistakenly sent an execution release to the wrong garnishment agency, when charged with failing to terminate a garnishment post petition. They assert all of the stress and strain experienced by D. Schultz was the direct result of the execution against his wages on two separate occasions in May of 2008, some five months postpetition, and that his medical conditions, including the malfunctioning of his pacemaker, as well as the prescription of additional medications and his time lost from work were the direct consequence of the belated execution. The Debtors argue that the practice of the Malen office in not keeping a copy of the original income execution, which was allegedly altered by Shor, and failing to follow up with the Onondaga County Sheriff's office after sending out the release of execution letter was simply not good policy and constituted a breach of duty.

Bankruptcy courts have frequently wrestled with the question of a willful stay violation where the creditor's act is one of omission, as opposed to commission. Pallino and Malen place a great deal of emphasis on the fact that as soon as they became aware of the Debtors' bankruptcy filing, they acted affirmatively to release Debtors' bank accounts that had been restrained, and they authorized

the discontinuance of the income execution. The failure to actually discontinue the income execution, they argue, was due to an "innocent clerical error." As far as their argument goes, the Court does not find fault with it; however, the Court concludes that it does not go far enough. The Court is of the opinion that once a creditor has put the wheels of collection in motion against a judgment debtor, upon learning of the filing of a bankruptcy by that debtor, the creditor must insure that the wheels of collection come to an immediate halt. Insuring that will happen requires more than simply notifying various types of collectors, e.g. garnishees, sheriffs, marshals, employers and others. There must be some degree of reasonable follow-up whereby the creditor is assured that the collection activity has ceased. In a series of decisions, Chief U.S. Bankruptcy Judge Carla E. Craig of the Eastern District of New York, observing that Code § 362(h)[7] is liberally construed by the courts of the Second Circuit, noted in *In re Parry*, 328 B.R. 655, 658 (Bankr. E.D.N.Y. 2005) that "[i]f § 362(h) were limited to violators who had an actual intent to violate the stay, 'the deterrent effect of the damages remedy, and the relief it affords wronged debtors, would be compromised inappropriately,'" quoting from *In re Robinson*, 228 B.R. 75, 81 (Bankr. E.D.N.Y. 1998). In *Parry*, postpetition, creditor's counsel faxed a letter to debtor's bank instructing the bank to release liens that the creditor had placed on debtor's accounts. The liens were not released. Creditor's attorneys argued that they had done everything they were required to do. They argued that the debtor's attorneys should have advised them when the liens were not released. Judge Craig disagreed, concluding that a creditor has an affirmative duty under Code § 362 to take the necessary steps to discontinue its collection activities against a debtor. She observed that, "[b]y failing to coordinate

---

[7] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") re-designated § 362(h) as § 362(k), applicable to the case herein.

10

with North Fork Bank or otherwise to take the necessary steps to ensure that the liens on Mrs. Parry's accounts were immediately released, Sharinn and Lipsie ("S&L") willfully violated the automatic stay." *Id*. at 659. Likewise, in *In re Wright*, 328 B.R. 660 (Bankr. E.D.N.Y 2005), the same attorneys, S&L, again sent a lien release letter to the debtor's bank, after delaying for approximately a month postpetition. The lien was not released until the debtor's attorneys moved to hold S&L in contempt. In the third case, *In re Henry,* 328 B.R. 664 (Bankr. E.D.N.Y. 2005), again featuring S&L, a lien had been placed on the debtor's bank account at Chase Bank on behalf of S&L's client. Following a familiar pattern, S&L again delayed over a month after receiving notice of the bankruptcy before sending a release to Chase. This time S&L asserted that the failure to send the release letter sooner was due to "an oversight and inadvertent error." Again, Judge Craig, in awarding attorneys fees to the debtor, noted that, "[i]t is well settled that a creditor has an affirmative duty under § 362 to take the necessary steps to discontinue its collection activities against a debtor. *Sucre v. MCI Leasing Corp. (In re Sucre),* 226 B.R. 340, 347 (Bankr. S.D.N.Y. 1998)." *See also In re Elder*, 12 B.R. 491 (Bankr. M.D.Ga. 1981) and *In the Matter of Sams*, 106 B.R. 485 (Bankr. S.D. Ohio 1989).

While the argument of Pallino and Malen, that they acted reasonably upon being notified of the Debtors' bankruptcy in discontinuing all collection activity, is somewhat persuasive, it must fail. If a creditor is permitted to avoid being charged with a willful violation by simply notifying third party collectors to cease and desist all collection activities and then failing to follow-up on that notice to insure that those activities have actually terminated, it opens the door to continued abuse of the stay. In addition, without the threat of a potential award of damages, creditors have no incentive to adopt a strict policy to avoid future stay violations. Here if Malen had followed up with Onondaga

11

County Sheriff' Office within a relatively short time after notifying it to terminate the income execution, its initial error would have been uncovered, and there would have been no stay violation some five months later when Shor served the execution on D. Schultz's employer.

Thus, the Court will turn to the issue of damages. Pallino and Malen initially argue that because the Debtors alleged only emotional distress, D. Schultz should not have been permitted to testify to loss of wages, the cost of various medications and medical procedures involving his pacemaker .They assert that such testimony comes as a surprise for which they had not prepared prior to the hearing.

At the evidentiary hearing, the Court overruled their objection, suggesting that Pallino and Malen could have conducted pre-hearing discovery on the issue of damages and elected not to do so. They seem to suggest that if a debtor claims emotional distress resulting from a willful violation of the stay, he/she is prohibited from proving actual damages. Such an argument defies reality. Emotional injury is just as real as physical injury, and there is no reason to conclude that actual damages can flow from one but not the other.

This Court has held that even where no pecuniary loss is shown, a court may nevertheless award actual damages for emotional distress. *See In re Ficarra*, Case No. 00-62714, slip op. at 11 (Bankr. N.D.N.Y. April 17, 2002). Here D. Schultz testified to the emotional distress that he experienced when he learned in May of 2008, some five months after filing bankruptcy, that his wages were being levied upon by a creditor who had sued him pre-bankruptcy. He testified that his distress caused him to go to a local emergency room for medical treatment. He noted that he had a pacemaker and an artificial heart valve at the time. He explained that he was put on a number of medications, and finally he testified that he lost three days from work during this period. All in all, he opined that he was out of

12

pocket approximately $1200. Somewhat less credible was his assertion that he was prevented from making his monthly mortgage payment due to the total deduction of $73.06 from his wages in the month of May 2008, as was the inference that emotional distress somehow caused the battery in his pacemaker to drain.

In his post-hearing submission, Debtors' attorney asserts that has expended some 13 hours in connection with this contested matter, and that his hourly rate is $200. He did not provide any contemporaneous time records.

Having considered all of the Debtor D. Schultz's testimony, the Court believes that he is entitled to recover his actual damages from Pallino and Malen[8]. This includes his out-of-pocket expenses and time lost from work in the total sum of $1200. He is also entitled to recover an additional $2000 for the angst directly caused by the levy of the execution at a point when he was entitled to feel that the trauma of personal bankruptcy was behind him. Finally he is entitled to recover attorneys fees in the sum of $2000.

Turning to the Debtors' request for punitive damages, the Court need only look to the language of the Second Circuit in *Crysen* to the effect that "[a]n additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h)." *Crysen*, 902 F.2d at 1105. This Court cannot conclude that the actions of Malen in this case come anywhere near satisfying that standard and, therefore, punitive damages are denied. IT IS SO ORDERED.

---

[8] Though not raised by the Respondents, there is no question that Pallino is liable to the Debtor, D. Schultz for the actions of Malen. *See In re Banderas,* 236 B.R. 841, 846 (Bankr. M.D.Fla. 1999).

13

Dated at Utica, New York

this 20th day of February 2009

                                               /s/ Hon. Stephen D. Gerling
                                               STEPHEN D. GERLING
                                               U.S. Bankruptcy Judge

Case 07-64144-6-dd    Doc 37    Filed 02/20/09    Entered 02/20/09 15:34:57    Desc Main
Document    Page 13 of 13